James H. **HARRISON,** Plaintiff,

v.

**AETNA LIFE INSURANCE COMPANY,** Defendant.

No. 94–1277–CIV–ORL–19.

United States District Court, M.D. Florida, Orlando Division.

April 24, 1996.

Keith J. Hesse, Foley & Lardner, Orlando, FL, for James H. Harrison.

Kirk M. Gibbons, Chorpenning, Good, Gibbons & Cohn, Tampa, FL, for Aetna Life Insurance Company.

### MEMORANDUM OF DECISION

GLAZEBROOK, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff James H. Harrison is a participant in, and a beneficiary of, an employee welfare benefit plan established and maintained by his employer, Eland Energy Corporation, pursuant to the Employee Retirement Income Security Act ("ERISA"). *See* 29 U.S.C. § 1002(1), (3), (5), (7), (8); Pretrial Stipulation ["PTS"], Docket No. 49 at 3. Defendant Aetna Life Insurance Company administers Eland Energy Corporation's ERISA-covered plan (the "Aetna plan").[1] Plaintiff brings this action against Aetna pursuant to 29 U.S.C. § 1132(a)(1)(B) to recover benefits which he claims are due under the "Comprehensive Medical Expense Coverage" provisions of the Aetna plan. *See* Plaintiff's Exhibit 1 ["PX1"] at 3–48; PTS, Docket No. 49 at 3. Specifically, plaintiff claims $33,-

---

1. This Court need not determine whether the Aetna plan was a single employer plan, a multiple employer plan, or both. Aetna provided group health insurance under Policy No. GP–434022 to the Wholesale Trade Industry Trust as policyholder trustee for the benefit of the employees of Eland Energy and others. *See* Defendant's Exhibit 1 [hereinafter referred to as "DX1"]. This opinion uses the term "Aetna plan" to refer to the Summary Plan Description booklet captioned *"Your* Group Plan" (issue date February 1, 1993) for Policy No. GP–434022, also referred to as the Certificate of Insurance, the bulk of which was provided to Harrison. *See* PX1, DX2.

851.90 in medical expenses which he paid in connection with orthognathic (jaw) surgery performed on June 28, 1994 on his son, Conor Harrison, together with prejudgment interest, costs, and attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). PTS, Docket No. 49 at 2–3. The district court has subject matter jurisdiction, and venue is proper in the Middle District of Florida. 29 U.S.C. § 1132(e); 28 U.S.C. § 1331. The Court conducted a nonjury trial on April 8–10, 1996.

## II. STANDARD OF REVIEW

■ For the reasons stated in this Court's order entered on May 17, 1995 [Docket No. 28], the de novo standard of review applies to the determination of whether the Aetna plan covers Conor Harrison's orthognathic surgery.[2] *See Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Kirwan v. Marriott Corporation,* 10 F.3d 784, 785, 789 (11th Cir.1994). Indeed, it is error to apply the arbitrary and capricious standard, rather than de novo standard, where a plan lacks express unambiguous language giving the administrator discretionary authority to determine eligibility benefits or construe the plan's terms.[3] *Kirwan,* 10 F.3d at 789.

■ In conducting a de novo review, the district court is not limited to the facts available to the plan administrator at the time of the coverage determination. *Kirwan,* 10 F.3d at 789, 790 n. 31; *Moon v. American Home Assurance Company,* 888 F.2d 86, 89 (11th Cir.1989). Under the de novo standard of review, a district court may consider ex-

pert testimony in interpreting the meaning of terms in a plan. *Masella v. Blue Cross,* 936 F.2d 98, 104 (2d Cir.1991) (experts properly assisted court in determining that plan beneficiary's non-surgical treatment for TMJ was "medical" and not "dental").

## III. THE LAW

### A. Interpreting an Employee Welfare Benefit Plan

#### 1. The Federal Common Law

■ The federal courts are charged with developing a body of federal substantive common law of rights and obligations under ERISA-regulated plans. *Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). The federal courts fashion common law by interpreting policy language, but are not required to make calculations based on the majority of decisions from other jurisdictions. *Arnold v. Life Insurance Company of North America,* 894 F.2d 1566, 1567 (11th Cir.1990). The nature of the federal action is to equitably enforce the ERISA plan. *Blake v. Unionmutual Stock Life Insurance Co. of America,* 906 F.2d 1525, 1526 (11th Cir.1990). A plaintiff has the burden of showing that he is entitled to the "benefits ... under the terms of his plan". 29 U.S.C. § 1132(a)(1)(B); *Farley v. Benefit Trust Life Insurance Company,* 979 F.2d 653, 658 (8th Cir.1992) (burden on plaintiff where "medically necessary" language at issue governed by the benefits section of the plan, not the exclusions section). The federal common law of equitable estoppel also may apply where a

---

**2.** There is no doubt that the plan provisions on which Aetna relies bear little resemblance to the typical plan provisions cited in recent decisions of the United States Court of Appeals for the Eleventh Circuit as the basis for a more deferential review. Although the de novo standard is the appropriate one, this decision makes an alternative finding solely for the purposes of assisting the court of appeals on review. In arriving at the alternative finding, this Court has analyzed the facts available to Aetna at the time it denied benefits in light of the heightened scrutiny for arbitrariness and caprice appropriate in cases involving a conflict of interest. *See Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476, 1480–82, 1486 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995); *Lee v. Blue Cross,* 10 F.3d

1547, 1551 n. 3, 1552 (11th Cir.1994) (correctness of insurer's interpretation of plan always reviewed de novo); *Anderson v. Blue Cross,* 907 F.2d 1072, 1076 (11th Cir.1990); *Newell v. Prudential Insurance Co. Of America,* 904 F.2d 644 (11th Cir.1990).

**3.** Appellate courts have previously subjected Aetna policies to de novo review. *See Kane v. Aetna Life Insurance,* 893 F.2d 1283, 1285 n. 2 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (de novo review appropriate where Aetna did not have discretion in administering the plan); *Aubrey v. Aetna Life Insurance Company,* 886 F.2d 119 (6th Cir.1989) (Aetna's interpretation of exclusions subject to de novo review).

plan administrator orally informs a beneficiary of its interpretation of an ambiguous term during hospitalization. *Kane v. Aetna Life Insurance,* 893 F.2d 1283, 1285 (11th Cir. 1990); *accord, National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558, 1572 (11th Cir.1991) (plan sponsor estopped to deny continuation coverage).

### 2. Injury or Disease

A plan may define "illness or disease" broadly so as to include a physical condition such as pregnancy. *See Blake v. Unionmutual Stock Life Insurance Co.,* 906 F.2d 1525, 1528 (11th Cir.1990). Such a definition, however, does not require that an episode of postpartum depression with psychotic features—which was treated primarily by psychiatrists in psychiatric units using psychiatric therapy and psychoactive drugs—is to be considered a covered physically-based non-mental illness. *Blake,* 906 F.2d at 1528, 1530 ("if it looks like a duck, walks like a duck, quacks like a duck ..."). If an insurer wishes to have a condition (e.g., pregnancy) treated the same as a "disease," it simply has to state it in the plan. *Aubrey v. Aetna Life Insurance Company,* 886 F.2d 119, 123 (6th Cir.1989) (Aetna defined "pre-existing condition" in terms of an "injury or disease," but neglected to include pregnancy).

### 3. Necessity

■ In *Florence Nightingale,* the Eleventh Circuit found that a variety of home nursing services were "medically necessary" because they were "essential" to prolong an AIDS patient's life, and to maintain its best possible quality as he suffered through his final days. 41 F.3d at 1483–84. The district court may consider all relevant evidence in determining whether treatment is "necessary" under an ERISA-covered plan. For example, in determining whether unapproved immuno-augmentive therapy was "essential to the treatment of cancer" and therefore "necessary" to fight cancer, the district court properly considered anecdotal testimony that ten out of 1700 patients had been successfully treated. *Dallis v. Aetna Life Insurance Company,* 768 F.2d 1303, 1305 (11th Cir. 1985). In *Dallis,* the district court also properly admitted evidence that Aetna once be-

fore had determined that charges for unapproved immuno-augmentive therapy were payable as covered medical expenses where Aetna had made the determination under a substantially similar group health policy in another jurisdiction. *Dallis,* 768 F.2d at 1306–07.

■ A plan administrator's procedure of having its own employee make determinations of medical need does not violate ERISA as a matter of law. *Newell v. Prudential Insurance Co. of America,* 904 F.2d 644, 650, 653–54 (11th Cir.1990). The plan administrator must analyze whether a procedure is "necessary" or "medically necessary" under the terms of the plan without importing an additional definition or different requirements. *Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476, 1483–84 (11th Cir.1995) (Blue Cross's Assistant Medical Director and chief claims evaluator never actually analyzed the elements of "medically necessary" listed in the plan, but rather injected a pre-certification definition not even mentioned in the plan); *but c.f., Newell,* 904 F.2d at 652 (record did not support charge that administrator's staff psychiatrist used subjective criteria outside of the tests contained in the policy to determine medical necessity).

■ In determining medical necessity, the claims administrator of an ERISA-covered plan is not obliged to contact the treating physician, and the district court is not required to give greater weight to the opinion of a treating physician who has an economic interest in the approval of the claim. *Jett v. Blue Cross,* 890 F.2d 1137, 1140 (11th Cir. 1989); *but see* dissent, 890 F.2d at 1141–42 n. 5 (Blue Cross gave inadequate reasons for not contacting two treating physicians who expressed professional judgment that hospitalization was necessary).

### 4. Ambiguity

■ Ordinary rules of construction require the district court to first assess the natural and plain meaning of the policy language, striving to give meaning to every provision. *Dahl–Eimers v. Mutual of Omaha,* 986 F.2d 1379, 1381–82 (11th Cir.), *cert.*

*denied,* 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993) (non-ERISA case containing instructional but non-binding summary of Florida law of ambiguity, and finding the undefined term "experimental" to be ambiguous in the context of a major medical insurance policy). The federal common law requires the district court to give effect to the unambiguous language of the policy when a term has only one possible construction. 894 F.2d at 1567 (no ambiguity in "irrecoverable loss of sight"). The language of an exclusion may focus without ambiguity on the purpose of surgery: e.g., no coverage of any "expense or charge in connection with dental work or dental surgery ... including ... surgery or splinting to adjust dental occlusion ..." *Kraut v. Wisconsin Laborers Health Fund,* 992 F.2d 113, 118 (7th Cir. 1993). Applying a deferential standard of review, the Seventh Circuit held that such a policy does not cover surgery to correct developmental orthognathic deformities if the surgery is performed "in connection with" surgery to adjust dental occlusion. 992 F.2d at 118. Similarly, the Seventh Circuit found no coverage even for non-cosmetic non-aesthetic reconstructive orthognathic surgery with a functional purpose given that the plan excluded coverage for any "loss, expense or charge which results from .. : reconstructive surgery ..." *Kraut,* 992 F.2d at 118.

A plan is ambiguous, however, when the parties can propose two reasonable interpretations of a plan's exclusion. *Lee v. Blue Cross,* 10 F.3d 1547, 1549–51 (11th Cir.1994) (exclusion pertaining to dental services). In *Lee,* an oral and maxillofacial surgeon cut and advanced a beneficiary's jaws to improve airflow and correct sleep apnea. An orthodontist also performed presurgical orthodontic decompensation, alignment, and stabilization in preparation for the bimaxillary advancement. 10 F.3d at 1549. The plan covered services "necessary for treatment of the insured's condition," but excluded services for the treatment "of the teeth or structures directly supporting the teeth," including orthodontic care. 10 F.3d at 1550.

The Eleventh Circuit determined that the plan was ambiguous as to whether it excluded medically necessary orthodontic care given that the parties proposed two reasonable interpretations of the dental services exclusion. 10 F.3d at 1550–51. The Court reasoned that an insured whose oral surgery only incidentally involved his teeth could not reasonably be expected to know that the plan excluded necessary orthodontic care performed as part of medically necessary surgery. 10 F.3d at 1550–51. Finding that the plan was ambiguous, the court of appeals applied the rule of *contra proferentum.* Construing the ambiguity against the drafter, the court of appeals found that Blue Cross' interpretation was wrong. 10 F.3d at 1551. Blue Cross' payment for the beneficiary's first office visit to the orthodontist provided additional support for the reasonableness of the plan beneficiary's interpretation. 10 F.3d at 1551.

In *Masella v. Blue Cross,* 936 F.2d 98 (2d Cir.1991), cited with approval in *Lee v. Blue Cross,* 10 F.3d 1547, 1551 (11th Cir.1994), the Second Circuit found a plan to be ambiguous given that the parties had proposed two reasonable interpretations of the plan's exclusion relating to dental services. The district court carefully considered both parties' experts and consultants before concluding that the beneficiary's non-surgical TMJ treatment was "medical" rather than "dental," and that Blue Cross had improperly construed its plan to exclude coverage. 936 F.2d at 105, 107. The Court found plaintiff's experts to be highly persuasive in describing the non-surgical treatment as principally related to the temporomandibular (jaw) joint, which is similar to other joints in the body, while acknowledging that the TMJ treatment has a peripheral dental component. 936 F.2d at 105–06. The district court found Blue Cross' independent consultant unpersuasive because of his focus on the title of the practitioner providing the treatment instead of on the nature of the procedure performed, and because of doubts about his independence. 936 F.2d at 105. The district court properly considered the use of the term "dental" as used by the maxillofacial surgeons. 936 F.2d at 106.

Lastly, silence can create an ambiguity. *Dahl–Eimers v. Mutual of Omaha,* 986 F.2d 1379, 1381–83 (11th Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 440, 126

L.Ed.2d 374 (1993), citing *Davis v. Crown Life Insurance Co.*, 696 F.2d 1343, 1346 (11th Cir.1983) (ambiguity resulting from silence in certificate of insurance which did not include controlling provision recited in master policy).

#### 5. Reasonable and Customary

■ A plan that requires that only "reasonable" charges be paid, but makes no reference to a pre-determined rate in the definition of "charge," requires analysis of the provider's rate and not the substitution of another rate that the administrator finds more reasonable. *Florence Nightingale*, 41 F.3d at 1479, 1483 (Blue Cross survey of private duty nursing rates was totally bereft of statistical significance).

### B. Prejudgment Interest, Costs, and Attorneys Fees

■ In any action by a plan participant or beneficiary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party. 29 U.S.C. § 1132(g)(1). The law provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action. *Florence Nightingale Nursing Service, Inc. v. Blue Cross*, 41 F.3d 1476, 1485 (11th Cir. 1995). In deciding whether to award attorneys fees under ERISA, the district court must consider (but need not discuss) the following factors, no one of which is dispositive, and some of which may not apply in a given case:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Florence Nightingale Nursing Service, Inc. v. Blue Cross*, 41 F.3d 1476, 1485 (11th Cir. 1995); *National Companies Health Benefit Plan v. St. Joseph's Hospital*, 929 F.2d 1558, 1575 (11th Cir.1991). In *Florence Nightingale*, the Eleventh Circuit found that Blue Cross had not acted in bad faith because it clearly had an arguable basis for its decision. 41 F.3d at 1485. In *National Companies*, the Eleventh Circuit found that the deterrent value of awarding attorney's fees was high. The Court reasoned that plan sponsors might force underfinanced beneficiaries to sue them to receive their benefits, or instead accept undervalued settlements, if the plan sponsor had little to lose but the amount it should have paid without litigation. 929 F.2d at 1575–76.

■ The district court has discretion to award prejudgment interest, even using state statutory rates as an analogy to fill a gap in ERISA law. *Florence Nightingale*, 41 F.3d at 1484 (awarding Alabama statutory rate of 18% applicable to inappropriate denials of insurance claims); *National Companies*, 929 F.2d at 1576 (awarding Georgia statutory rate of 18% which was charged by hospital for unpaid bills).

### IV. FINDINGS OF FACT

Dr. Carl Dann III, D.D.S., an orthodontist, diagnosed Conor Harrison at age six as having a severe Class II malocclusion on June 18, 1985. PX5; DX3 (cc). As a result, the teeth in Conor Harrison's upper and lower jaws did not contact each other properly. Because of this, he was unable to establish normal jaw function. He was also unable to close his lips at rest without effort. Conor Harrison could not sleep with his mouth closed, thereby leading, to some extent, to dryness of the mouth and gums.

From 1985 to August 1993, Dr. Dann attempted to correct Conor Harrison's malocclusion with appliances, braces, headgear, bands, wires, elastics, and similar orthodontic devices. PX5; DX3 (cc), 9(a). In August 1993, Dr. Dann referred Conor Harrison for surgical evaluation to Christopher G. Rafferty, D.M.D, a diplomate of the American Board of Oral & Maxillofacial Surgeons whose practice included reconstructive surgery of the jaws. PX5, 6; DX3 (a), 3(b). Dr. Rafferty recommended jaw surgery to correct the malocclusion, and returned Conor

Harrison to Dr. Dann for a course of pre-surgical orthodontic treatment designed to return Conor Harrison's teeth to their uncorrected state so that they would be better aligned after surgery. PX5, 6; DX3 (a), 3(b), 3(k). Drs. Rafferty and Dann planned Conor Harrison's surgery for the Summer of 1994. PX4, 5; DX 7(a).

On August 30, 1993, Dr. Rafferty wrote to Aetna to request a predetermination that the Aetna plan would cover the surgery. DX3 (a). Dr. Rafferty informed Aetna of his diagnosis from clinical and x-ray examination: major anomaly of jaw size, mandibular hypoplasia, mandibular asymmetry, and vertical maxillary hyperplasia. DX3 (a). Dr. Rafferty proposed surgical correction of the condition by Lefort I maxillary osteotomy in one segment with rigid fixation; bilateral mandibular ramus osteotomy with rigid fixation; application of mandibular bone plates and screws; and horizontal osteotomy of the inferior border of the mandible (also called genioplasty or chin augmentation).[4] DX3 (a). Dr. Rafferty's letter emphasized his opinion that "this procedure is a skeletal correction of a functional deformity." DX3 (a) at 2.

On August 31, 1993, Dr. Rafferty wrote a second letter to Aetna stating:

> The patient has a functional musculoskeletal disorder affecting the facial skeleton. The bony structure of the patient's jaws is positioned so that it is impossible for the patient to achieve adequate jaw function. The patient has sought dental and orthodontic consultation in an attempt to find a nonsurgical solution to this skeletal problem. The magnitude of the skeletal abnormality is beyond dental and/or orthodontic correction. In other words, the teeth cannot be compensated to overcome the functional bony problem. Surgical repositioning of the patient's jaw is medically necessary to establish physiologic jaw function. The planned surgery is NOT dental or cosmetic in nature. The surgery is NOT TMJ surgery. The patient will be hospitalized for two to four days to undergo the surgery.

DX3 (b). Dr. Rafferty's letter also encloses cephalometric radiographs and tracings of Conor Harrison's jaw, invites Aetna to request additional diagnostic material, and invites Aetna's consultant to examine Conor Harrison in Dr. Rafferty's office. DX3 (b) at 2; 3(c), 3(d), 3(e).

On November 2, 1993, an Aetna dental consultant assistant requested pre-orthodontic and post-orthodontic study models from Dr. Rafferty. DX3 (h). On December 1, 1993, Dr. Robert L. Bump, D.D.S., Aetna's oral and maxillofacial surgery consultant in San Antonio, Texas, wrote a one-page handwritten interoffice memorandum to Aetna in Tampa, Florida. DX3(I). Dr. Bump is a diplomate of the American Board of Oral and Maxillofacial Surgery. DX11. In the memorandum, Dr. Bump notes Conor Harrison's diagnoses, notes the surgical procedures recommended, and notes "no models available." DX3 (I). Dr. Bump then comments that "[w]hile the proposed treatment will improve the pts facial harmony and will alter his facial skeletal relationship, it will not meaningfully improve his masticatory function." DX3(I). Dr. Bump recommends to Aetna: "not med nec care." DX3 (I).

On December 10, 1993, Aetna sent an unsigned computer-generated pre-treatment benefit determination letter to Dr. Rafferty denying coverage for all of the proposed surgery and related expenses. DX3(j). Aetna denied coverage on the grounds that the improvement of facial harmony and facial skeletal relationships was not covered, and that the proposed surgery was not necessary for the treatment of a disease or injury:

OUR PLAN PROVIDES BENEFITS FOR SERVICES AND SUPPLIES WHICH ARE NECESSARY FOR TREATMENT OF DISEASE OR INJURY. THE SERVICES MUST BE BROADLY ACCEPTED PROFESSIONALLY AS EFFECTIVE, APPROPRIATE AND ESSENTIAL TO THE TREATMENT OF DISEASE OR INJURY. BASED ON THE INFORMATION PROVIDED, THIS EXPENSE IS NOT COV-

---

**4.** Harrison has abandoned his claim for the genioplasty procedure because it is excluded cosmetic surgery.

ERED. IF THERE IS ADDITIONAL INFORMATION THAT SHOULD BE BROUGHT TO OUT ATTENTION, PLEASE LET US KNOW.

THERE ARE NO BENEFITS, PER SE, TO IMPROVE FACIAL HARMONY OR FACIAL SKELETAL RELATION-SHIPS. WHILE THE PROPOSED SURGERY WILL IMPROVE THE PA-TIENT[']S FACIAL HARMONY AND APPEARANCE, IT WILL NOT MEAN-INGFULLY IMPROVE MASTICATORY FUNCTION.

DX3(j) (capitalization in original).

Eight months later as the surgery date approached, Dr. Rafferty wrote a third letter to Aetna dated May 19, 1994. DX3 (k). Dr. Rafferty disagreed with the reasons that Aetna had given for denying benefits, and asked Aetna to re-evaluate the claim.[5] Dr. Dann also wrote to Aetna to express his opinion that the orthognathic surgery proposed for Conor Harrison was medically necessary.[6]

Mavis Barnett, Aetna's Senior Cost Containment Analyst referred Dr. Rafferty's request to Aetna's medical area for review.

DX3 (m), 3(n). Aetna received post-orthodontic study models, received photographs of pre-orthodontic study models, and confirmed that the plaster pre-orthodontic study models were no longer available.[7] DX3 (t), 3(u), 3(w), 3(cc).

Dr. Rafferty, assisted by Dr. Morales, D.M.D., performed the surgery on Conor Harrison on June 28, 1994. The surgery was successful. Prior to surgery, Conor Harrison had misaligned jaws and extremely poor interdigitation. After the surgery, Conor Harrison had normal alignment and good interdigitation, with all teeth hitting properly. Lip closure was normal. The surgery did result in some improvement to Conor's masticatory function.

Drs. Rafferty and Morales submitted claim forms to Aetna the next day. DX3 (y), 3(z). On July 7, 1994, Dr. Bump reviewed post-orthodontic models, photographs of models, x-rays, cephalograms, post-orthodontic tracings, and the letters from Drs. Rafferty and Dann, as well as Dr. Bump's prior review of December 1, 1993. DX3 (dd). Dr. Bump recommended that Aetna deny the claim for

5. Dr. Rafferty gave Aetna the following reasons [DX3 (k)]:

> My patient, Connor [sic] Harrison, has a significant skeletal malocclusion. He has vertical maxillary excess which pops open his lower jaw making it difficult for him to achieve adequate lip closure without significant strain. In turn, this causes chronic air exposure of the gingiva leading to desiccation and gingivitis which is impossible to eradicate. Also, he has moderate mandibular deficiency with severely flared mandibular anterior teeth. He has poor inner digitation of his posterior teeth which does present a moderate compromise in masticatory function and causes excessive wear on his posterior teeth due to their poor fit. The flaring of the mandibular anterior teeth jeopardizes their long term periodontal health which obviously would compromise masticatory function. These problems are confirmed by the computerized cephalometric analysis which I again submit to you for your review. "The facial skeletal harmony" is directly related to the relationship between the upper and lower jaw. The relationship between the upper and lower jaw directly influences the relationships between the upper and lower teeth. I submit to you that by improving his facial skeletal harmony, we will enhance the position of the jaws and as a result the position of the lips, teeth, and occlusion. All of

these factors directly impact the patient's masticatory function. Our goal is to improve that function by the necessary surgical-orthodontic procedures which will enhance it and any enhancement of "facial skeletal harmony" is merely a byproduct of this process.

6. Dr. Dann stated [DX3 (cc)]:

> I have worked on Conor for approximately eight years with intrusive forces to impact the maxilla hoping to resolve the dental problems created by the long face syndrome. We achieved positive growth patterns between the years of 1988 and 1990. I feel that the underlying hereditary skeletal problem exerted itself and overrode the early correction we achieved. Therefore, after treating this patient for eight years, it was elected that the underlying skeletal problem be corrected orthognathically as all conservative means of correcting the underlying skeletal problem orthodontically had been exhausted.

7. By "pre-ortho study models," Aetna was requesting plaster models "which are prior to bands being placed ..." DX3 (bb). Dr. Dann had begun Conor Harrison's orthodontic treatment in June 1985, eleven years earlier. DX3 (cc), 9(a). Dr. Dann testified that his office did not have enough space to keep models that long. DX4 (h), 4(n).

"[n]ot essential care" based on the same reasons as his earlier denial. DX3 (dd), 3(ee). On July 19, 1994, Aetna's Senior Cost Containment Analyst then wrote to Dr. Rafferty denying the claim, but acknowledging that "[w]e are obligated to pay for services that constitute usual, reasonable and customary treatment." DX3 (ff). The letter notes that:

> we are not making a judgment concerning the effectiveness of treatment.

> \* \* \* \* \* \*

> It was determined that Connor's [sic] pretreatment dental occlusion does not reflect a significant functional disability. The proposed treatment will not meaningfully improve Connor's [sic] masticatory function.

DX3 (ff).

The Aetna plan contains a section captioned "**Comprehensive** Medical Expense Coverage", which begins with a section on "Covered Medical Expenses." DX2 at 3 (emphasis supplied). The Aetna plan qualifies covered medical expenses as follows:

> They are the expenses for certain **hospital** or other medical services and supplies. They must be for the treatment of an injury or disease. Here is a list of Covered Medical Expenses.

DX2 at 3.[8] The section on "Covered Medical Expenses" describes which medical services and supplies are covered.

Although "comprehensive," the coverage is not unlimited. The coverage section of the Aetna plan, which appears before the general exclusions section, lists certain "Limitations" on covered medical expenses. DX2 at 3–20. The "Limitations" section sets out limitations on the coverage which has been extended as a "Covered Medical Expense." The Aetna plan contains the following limitation on cov-

ered medical expenses captioned "**Mouth, Jaws And Teeth**" [DX2 at 12]:

**Mouth, Jaws And Teeth**

Expenses for the treatment of the mouth, jaws, and teeth are Covered Medical Expenses, but only those for:

· services rendered;  and

· supplies needed;

for the following treatment of or related to conditions of the:

· teeth, mouth, jaws, jaw joints;  or

· supporting tissues (this includes bones, muscles, and nerves).

Surgery needed to:

· Treat a fracture, dislocation, or wound.

· Cut out:

teeth partly or completely impacted in the bone of the jaw;

teeth that will not erupt through the gum;

other teeth that cannot be removed without cutting into bone;

the roots of a tooth without removing the entire tooth;

cysts, tumors, or other diseased tissues.

· Cut into gums and tissues of the mouth. This is only covered when not done in connection with the removal, replacement or repair of teeth.

· Alter the jaw, jaw joints, or bite relationships by a cutting procedure when appliance therapy alone cannot result in functional improvement.

Harrison claims that, although Conor Harrison's surgery was not treatment for an "injury or disease,"[9] it was nevertheless a covered medical expense because the "Mouth, Jaws And Teeth" limitation extends coverage. Plaintiff notes that the limitation clearly states that "[e]xpenses for the treatment of the mouth, jaws, and teeth *are Covered Medical Expenses.*" Harrison further

---

**8.** Bold terms in the original are defined terms in the plan's glossary. "Injury or disease" is not such a defined term, but rather is a qualification of the term "Covered Medical Expense."

**9.** In a response to a request to admit, Harrison stated that he was unable to admit or deny whether the surgical expenses were for the treatment of an injury or disease, DX19, 20, although the services "were most likely not for the treatment of an injury [or disease] as that term is

commonly understood ..." DX20. Harrison admitted that "the misalignment of Conor Harrison's jaw was not the direct result of a disease as that term is commonly understood ..." DX20. Harrison noted in his admissions that neither term is defined in the Aetna plan. DX20. Pursuant to a court order, Harrison later admitted that the expenses were not for the treatment of an injury or disease. DX21.

argues that he has claimed only for the following covered services: 1.) "services rendered ... for the ... treatment of or related to conditions of the ... mouth [and] jaws ..."; 2.) for "[s]urgery needed to ... [c]ut into gums and tissues of the mouth ... when not done in connection with the removal, replacement or repair of teeth"; and 3.) for "[s]urgery needed to ... [a]lter the jaw, jaw joints, or bite relationships by a cutting procedure when appliance therapy alone cannot result in functional improvement." DX2 at 12–13. Harrison argues that the "Mouth, Jaws And Teeth" limitation nowhere contains a requirement that the surgery be for the treatment of an "injury or disease," but only that the surgery be rendered for the treatment of a condition of the jaw.

First, Aetna contends that Conor Harrison's surgery is not covered under the Aetna plan because it was not for the treatment of an "injury or disease," and therefore is not a covered medical expense. Aetna argues that the Court must read the "injury or disease" qualification into the term "Covered Medical Expense" as that term appears in the "Mouth, Jaws And Teeth" limitation. Although the surgery did alter Conor Harrison's jaw and bite relationships by a cutting procedure, Aetna contends that appliance therapy alone can and did result in functional improvement. Aetna seems to concede, however, that the surgery did cut into the gums and tissue of Conor Harrison's mouth, and was not done in connection with the removal, replacement, or repair of teeth. See Aetna's Proposed Findings of Fact.

Second, Aetna contends that the plan *excludes* coverage for the surgery. Aetna contends that Conor Harrison's surgery was not "necessary" because there was no physical condition involved, and because there were no documented medical problems related to his facial and jaw configuration.[10] Third, Aetna claims that the exclusion for cosmetic surgery also applies because the surgery merely improved, altered, and enhanced Conor Harrison's appearance, but did not improve the function of a part of his body that is not a tooth or structure that supports the teeth, and did not improve the function of a part of his body that is malformed as a result of a severe birth defect.[11] *See* DX2 at 22.

This Court must first assess the natural and plain meaning of the Aetna plan language, giving effect to the unambiguous language of the plan, and striving to give meaning to every provision. The term "Covered Medical Expense" is subject to the qualification that the expense must be for the treatment of an injury or disease. DX2 at 3. If the Aetna plan extends coverage only through its "Covered Medical Expense" provision—and not through limitations on coverage or exclusions from coverage—then it follows that all "Covered Medical Expenses" must be for the treatment of an injury or disease. The Aetna plan's limitations section, however, includes as covered medical expenses a number of expenses related to physical conditions that are not normally considered to be an "injury or disease" under their natural and plain meaning. For example, according to the limitations section, the following *are* covered medical expenses: prenatal care, delivery, and post-partum care, DX2 at 6; congenital spinal disorders such as scoliosis, DX2 at 8; negative cancer screening tests, DX2 at 12; surgery to cut out teeth partly impacted in the bone of the jaw, and teeth that will not erupt through the gum,

10. The Aetna plan does not provide coverage for services: "[n]ot **necessary,** as determined by Aetna, for the diagnosis, care or treatment of the physical or mental condition involved. This applies even if they are prescribed, recommended or approved by the attending **physician** or **dentist.**" DX2 at 21. "Necessary" means a service or supply which is necessary for the: diagnosis; or care; or treatment; of the physical or mental condition involved. It must be widely accepted professionally in the United States as: effective; and appropriate; and essential; based upon recognized standards of the health care specialty involved." DX2 at 45.

11. The Aetna plan does not cover charges "for plastic surgery; reconstructive surgery; cosmetic surgery; or other services and supplies; which improve, alter, or enhance appearance, whether or not for psychological or emotional reasons, except to the extent needed to: [i]mprove the function of a part of the body that: is not a tooth or structure that supports the teeth; is malformed; as a result of a severe birth defect; this includes harelip or webbed fingers or toes; as a direct result of: disease; or surgery performed to treat a disease or injury." DX2 at 22.

DX2 at 12. Also, according to the exclusions section of the plan, covered medical expenses may include surgery to repair body parts that are malformed as a result of a severe birth defect, including harelip and webbed fingers or toes, DX2 at 22; and health expenses for a fully handicapped child through retardation or physical handicap, DX2 at 30. Striving to give meaning to every provision, either the "injury or disease" qualification of the term "Covered Medical Expense" in the Aetna plan is very broad (i.e. pre-natal care and surgery needed to cut out impacted teeth are treatment of an "injury or disease"), or the Aetna plan actually *extends* coverage through its limitations and exclusions (i.e. pre-natal care and surgery needed to cut out impacted teeth is not treatment for an "injury or disease," but is nevertheless a covered medical expense).

The parties agreed at trial, however, that the Aetna plan actually *extends* coverage not only through its coverage provisions, but also through some of its limitations.[12] Apparently, those provisions include the "Birthing Center Expenses" provision, the "Spinal Disorder Expenses" provision, the "Routine Screening For Cancer" limitation, and the "Mouth, Jaws And Teeth" limitation. DX2 at 6, 8, 12. Some expenses that are not incurred in connection with a disease or injury are nevertheless "Covered Medical Expenses": e.g. pre-natal care, delivery, spinal disorders including scoliosis, mammograms, and prostate tests. The parties dispute, however, whether expenses that are not incurred in connection with a disease or injury, but are incurred for treatment of conditions of the jaw, are covered by virtue of the "Mouth, Jaws, And Teeth" limitation.

■ The "Mouth, Jaws And Teeth" limitation in the Aetna plan is ambiguous. Harrison and Aetna each propose two reasonable interpretations of the provision. Harrison proposes that surgical expenses for the treatment of his mouth and jaws are covered medical expenses in that the expenses are for services for the treatment of conditions of the jaws, and for surgery 1.) needed to cut into gums and tissues of the mouth (not done in connection with the removal, replacement, or repair of teeth), and 2.) needed to alter the jaw and bite relationship by a cutting procedure when appliance therapy alone cannot result in functional improvement. Aetna proposes that expenses for the treatment of the jaws are only covered medical expenses when they are expenses for the treatment of an injury or disease.

■ Harrison's interpretation of the exclusion is reasonable. The "Mouth, Jaws And Teeth" exception expressly includes expenses for the treatment of the jaws as covered medical expenses. DX2 at 12. Aetna could have drafted the provision to expressly limit coverage for jaw surgery to coverage for jaw surgery associated with an "injury or disease." *See, e.g.*, DX2 at 12 (limitation for cancer tests which are not incurred in connection with a disease or injury expressly *in*cluded in "Covered Medical Expenses"). Silence in the Aetna plan creates an ambiguity. In light of the other provisions in the Aetna plan that extend coverage to medical expenses not incurred in connection with a disease or injury, an insured anticipating orthognathic surgery could not reasonably be expected to know whether the Aetna plan covers surgery for a skeletal jaw anomaly despite Aetna's denial of precertification.[13] Because the provision is ambiguous, the rule of *contra proferentum* applies. The Court

---

12. At trial, Aetna declined to take the position that a broad definition of "injury or disease" could explain why an expense for pre-natal care is a "Covered Medical Expense" in light of that term's "injury or disease" qualification. DX2 at 3. Aetna had a different explanation for why the plan covered some expenses that are not incurred in connection with a disease or injury. According to Aetna, the plan contains provisions, including limitations on "Covered Medical Expenses," that actually *extend* coverage to medical expenses that are not incurred in connection with a disease or injury.

13. Aetna's payment for Conor Harrison's visit to Dr. Rafferty to have his wisdom teeth removed provides additional support for the reasonableness of Harrison's interpretation. Although Aetna took the position at trial that Aetna paid the claim by mistake, the payment suggests that even Aetna's cost containment analysts may have viewed the surgery as covered under the "Mouth, Jaws And Teeth" provision.

construes the ambiguity against the drafter. In other words, expenses for the treatment of the mouth and jaws are "Covered Medical Expenses" under the "Mouth, Jaws And Teeth" provision even if they are not incurred in connection with an injury or disease.

■ The evidence at trial demonstrated that Conor Harrison had a skeletal disorder that restricted normal jaw function. Specifically, he had a major anomaly of jaw size, mandibular hypoplasia and asymmetry, and vertical maxillary hyperplasia. DX3 (a), 3(b), 3(k); PX63, 65, 66. The Lefort I maxillary osteotomy and bilateral mandibular ramus osteotomy was needed to cut into Conor Harrison's gums and mouth tissues, and was not done in connection with the removal, replacement, or repair of his teeth. DX3 (a), 3(b), 3(cc), 4(j); PX63, 65, 66. The surgery altered Conor Harrison's jaw and bite relationship by a cutting procedure. Although appliance therapy alone had resulted in a partial functional improvement of the dental malocclusion over several years with continuing setbacks, the appliance therapy alone could never result in a full or permanent functional improvement of the skeletal jaw anomaly or the Class II malocclusion. DX3 (cc), 11; PX63, 65, 66. After Conor Harrison had stopped growing, surgery was the only way to correct his skeletal jaw problem instead of camouflaging it through ineffective orthodontic means. The "Mouth, Jaws And Teeth" limitation therefore provided coverage for Conor Harrison's surgery unless otherwise excluded.

The weight of the evidence does not support Aetna's defense that the surgical expense was properly excluded as not "necessary" for the treatment of the physical condition involved (major anomaly of jaw size, mandibular hypoplasia and asymmetry, and vertical maxillary hyperplasia). DX3 (b), 3(k), 3(cc), 4(d); PX63, 65, 66. The surgery was widely accepted professionally in the United States as effective, appropriate, and essential for the treatment of such a skeletal disorder based upon recognized standards of oral and maxillofacial surgeons. PX 65, 66; *see* expert testimony regarding provisions in Proffit & White, *Surgical–Orthodontic Treatment* (Mosby Year Book, Inc.) [identified but not introduced as PX 119]. In any event, the exclusions do not apply to the extent that coverage is specifically provided by name in the plan booklet. DX2 at 23; PX65. The "Mouth, Jaws And Teeth" provision specifically provides for surgery to alter the jaw or bite relationships. DX2 at 13.

After carefully considering the testimony and reports of both parties' experts and consultants, the Court concludes that Conor Harrison's orthognathic surgery was necessary and essential to correct the diagnosed skeletal deformity of his jaw, and to correct his Class II malocclusion (a bite relationship), and not merely nonessential cosmetic surgery to improve his appearance when appliance therapy alone can result in functional improvement. PX63, 65, 66. The services provided to Conor Harrison were necessary because they were essential to correct his orthognathic deformity, and to maintain an acceptable occlusion or bite as he grew into adulthood.[14] PX63, 65, 66.

The Court finds plaintiff's experts—treating physicians Rafferty and Dann, and G. William Arnett, D.D.S., F.A.C.D., a nationally recognized oral and maxillofacial surgeon—to be highly persuasive in describing Conor Harrison's jaw condition as a skeletal deformity that cannot be corrected by continued appliance therapy, while acknowledging that the surgery had a peripheral benefit to Conor Harrison's appearance. PX63, 65, 66. The Court finds Aetna's independent consultants considerably less persuasive. Dr. Bump receives an annual salary from Aetna, and is hardly independent. DX11. After spending only twenty minutes on each of two reviews, Dr. Bump testified that he had determined that the surgery was not medically necessary by applying his own standard, and

14. The Court admitted a broad array of evidence relevant to whether the surgery was a necessary covered expense, but denied the admission of evidence that Aetna once before had determined that charges for orthognathic surgery were payable as covered medical expenses. Plaintiff did not prove that Aetna had made the determination under a **substantially similar** group health policy. *See Dallis,* 768 F.2d at 1306–07.

not the standard described in the Aetna plan. Indeed, Dr. Bump did not even know the Aetna plan's standard for necessity. Aetna's procedure of having its own employee make determinations of medical need, standing alone, does not violate ERISA as a matter of law. Aetna, however, must analyze whether a procedure is "necessary" under the terms of the Aetna plan without importing an additional definition or different requirements. It is relevant that Aetna's claims evaluator never actually analyzed the elements of "necessary" listed in the plan, but rather injected a definition not mentioned in the plan. The record supports Harrison's charge that Aetna's consultant used subjective criteria outside of the tests contained in the policy to determine necessity.

According to Dr. Bump, the type of surgery performed on Conor Harrison would only be necessary and essential for the most severe mandibular deficiency, vertical maxillary excess, and Class II malocclusion. He concludes, consistent with Aetna's interest, that the true reason for Conor Harrison's surgery was to improve his appearance, and not the function of his jaw and occlusion. This opinion is inconsistent with the opinions of the plaintiff's oral surgeons and orthodontist, with the other evidence introduced at trial, and with common sense.

The record contains no credible evidence that Mr. and Mrs. Harrison were so concerned about their son's appearance that they subjected him to invasive, traumatic, risky, and painful surgery—for which the Harrisons might have been required to pay in full—merely to make a good-looking boy even more handsome. *See* DX4(j); 9(a), 9(b), 9(c), 9(e). The surgery required the sawing and drilling of a 15–year-old boy's jaw bones under general anesthesia including a sagittal split; cleavage of his nasal wall and septum; rigid fixation of his jaw bones with screws, titanium plates, and interosseous wires; and closure of the intra-oral incision with gut suture. PX16, 27; DX3 (a). Conor Harrison

never visited a plastic surgeon in the entire course of his orthodontic treatment since 1985. Aetna introduced the only plastic surgeon into the case, Aetna's consultant Dr. George J. Haedicke, D.M.D., M.D., to state the opinion that Conor Harrison's surgery was primarily for cosmetic reasons.

The Court rejects Aetna's contention that the real purpose of the surgery was to improve, alter, enhance Conor Harrison's appearance. The Court also rejects Aetna's suggestion that Dr. Dann, a close friend of Harrison, and Dr. Rafferty, a social acquaintance of Harrison, convinced Harrison to permit unnecessary surgery on his son for the doctors' pecuniary gain. The Court has given appropriate weight to the social and financial incentives that bear on the testimony of Drs. Dann and Rafferty on behalf of Harrison.[15] The exclusions, therefore, do not preclude coverage.

Harrison paid for his son's jaw surgery. The total amount of outstanding charges, net of deductibles and insurance payments already made by Aetna, and excluding any amount for the chin augmentation, totals $33,851.90. This amount comprises the following elements:

| | |
|---|---|
| Surgeons' and assistant surgeons' fees | $14,783.50 |
| Radiology | $47.20 |
| Hospital bill | $16,721.20 |
| Anesthesiologist | $2,289.00 |
| Health care equipment | $11.00 |
| Total: | $33,851.90 |

The Aetna plan requires the payment of only "reasonable charges". A "reasonable charge" is the lower of a provider's usual charge and the charge that Aetna determines to be the prevailing charge in the geographic area. DX2 at 47. Aetna relied on a compilation of rates that it states is reasonable and customary in the area, as well as a formula for charges by assisting surgeons. Aetna introduced no evidence as to whether the compilation and formula actually results in charges that reflect the prevailing charges in

---

**15.** In determining necessity, Aetna is not obliged to contact Conor Harrison's treating physicians. Also, the Court is not required to give greater weight to the opinion of Conor Harrison's treating physicians who, in theory, have an economic interest in the approval of the claim (Dr. Dann worked without charge). Nevertheless, the court may consider the reasons that Aetna gave for not contacting two treating physicians who expressed professional judgment that Conor Harrison's surgery was necessary.

central Florida, or evidence that the conclusions are statistically significant.

■ The court exercises its discretion to allow a reasonable attorney's fee and costs to Harrison pursuant to 29 U.S.C. § 1132(g)(1). The district court has considered several factors. Aetna did not act with bad faith in denying the claim, although it clearly acted in its own financial interest. The Court understands but rejects the argument that a plan administrator is obliged to carefully underwrite existing plans to protect other plan participants. Aetna had an arguable basis for denial under Aetna's reading of the Aetna plan, and decided to assume the risk of litigation costs and attorneys fees by denying the claim in light of the plan's ambiguity. This enabled Aetna to also deny similar claims, if any, and put all claimants to the expensive test of litigation. Aetna is well able to satisfy an award of attorneys' fees. An award of attorneys' fees against Aetna would deter other insurance companies acting as administrators from denying similar claims.

The deterrent value of awarding attorney's fees is high. With little to lose but the amount that should have been paid without litigation, Aetna and other carriers might be encouraged to force beneficiaries to sue them to receive their benefits, or to instead accept undervalued settlements. Harrison, to some extent, sought to benefit all participants and beneficiaries of the ERISA plan. Harrison is president of Eland Energy, and has some responsibility for selecting a plan administrator that in fact provides the benefits as enumerated to Eland's employees. Harrison, however, did not seek to resolve a significant legal question regarding ERISA itself. For the reasons stated in this opinion, the relative merits of the parties' positions weigh heavily in favor of awarding a reasonable attorneys' fee to Harrison, provided that it is a fee that he is obligated to pay.

■ For similar reasons, the Court also exercises its discretion to award prejudgment interest from July 19, 1994, the date of Aetna's second coverage denial letter, to the date of the judgment, at the rate of 5.31%

per annum. The rate, which is used as an analogy to fill a gap in ERISA law, is the federal statutory rate normally used for *post-judgment* interest as of July 19, 1994. *See* 28 U.S.C. § 1961.

## V. CONCLUSION

Plaintiff James H. Harrison has met his burden of showing that he is entitled "to recover benefits due to him under the terms of his plan" within the meaning of 29 U.S.C. § 1132(a)(1)(B).[16] The Clerk shall enter judgment for Plaintiff James H. Harrison and against Defendant Aetna Life Insurance Company in the amount of $33,851.90; prejudgment interest from July 19, 1994 to the date of the judgment at the rate of 5.31% per annum; a reasonable attorneys' fee and costs of the action pursuant to 29 U.S.C. § 1132(g)(1) to be taxed on motion and bill of costs; with the judgment to bear interest at the statutory rate.

**DONE AND ORDERED.**

16. As an alternative finding, based on the facts available to Aetna at the time of its second denial, Aetna's denial was wrong, arbitrary, and capricious.