**Marlowe BLAKE and Pam Blake,
Plaintiffs–Appellants,**

v.

**UNIONMUTUAL STOCK LIFE INS.
CO. OF AMERICA,
Defendant–Appellee.**

No. 89–5334.

United States Court of Appeals,
Eleventh Circuit.

July 30, 1990.

Joel S. Perwin, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, Miami, Fla., for plaintiffs-appellants.

William J. Gallwey, III, Shutts & Bowen, Miami, Fla., Peter J. Guffin, Asst. Counsel, Unionmutual Life Ins. Co., Portland, Me., for defendant-appellee.

Before FAY, Circuit Judge, RONEY *, Senior Circuit Judge, and PITTMAN **, Senior District Judge.

PER CURIAM:

Maintaining that additional compensation of $33,269 is due under a group health insurance policy, Marlowe and Pam Blake brought a civil action pursuant to 29 U.S.C.A. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA).[1] The district court held that the insurance company's responsibility for Pam Blake's medical bills, which were incurred for extensive psychiatric care related to a postpartum depression, a complication of

---

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

\*\* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. **§ 1132. Civil enforcement**
    **(a) Persons empowered to bring a civil action**

A civil action may be brought—
    (1) by a participant or beneficiary—
    (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

pregnancy, was limited under the policy's coverage of mental illness. The Blakes' claim that postpartum depression is covered under "the sickness," rather than "the mental illness," section of the policy, and that, in any event, they were entitled to a jury trial. We affirm.

As to the claim to a jury trial under the Seventh Amendment, appellants concede that this Circuit has held that plaintiffs are not entitled to a jury trial under ERISA when the issue is whether it was arbitrary or capricious for benefits to be denied. *Chilton v. Savannah Foods & Industries, Inc.,* 814 F.2d 620 (11th Cir. 1987) (rejecting claim that a suit for benefits under 29 U.S.C.A. § 1132(a)(1) should be tried to a jury); *Howard v. Parisian, Inc.,* 807 F.2d 1560 (11th Cir.1987) (stating that the former Fifth Circuit squarely held that plaintiffs in actions under 29 U.S.C.A. § 1132(a)(1)(B) are not entitled to trial by jury); *Calamia v. Spivey,* 632 F.2d 1235, 1237 (5th Cir.1980), (following *Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820 (7th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)).

Circuit courts dealing with the jury trial issue in ERISA-regulated plans have generally followed *Wardle's* reasoning. *Cox v. Keystone Carbon Co.,* 894 F.2d 647 (3rd Cir.1990) (plaintiff's claim to Seventh Amendment jury trial dealt fatal blow by earlier decisions that section 502(a)(1)(B) claims are equitable in nature) *petition for cert. filed,* (U.S. Apr. 20, 1990) (No. 89–1721); *Daniel v. Eaton Corp.,* 839 F.2d 263, 268 (6th Cir.) (no right to a jury trial under § 502) (citing *Crews v. Central States,* 788 F.2d 332, 338 (6th Cir.1986)), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *Berry v. Ciba–Geigy,* 761 F.2d 1003, 1006–07 (4th Cir.1985) (no right to jury trial in termination of pension benefits); *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *In re Vorpahl,* 695 F.2d 318 (8th Cir.1982) (no jury trial required in cases under section 502). *But cf. Stamps v. Michigan Teamsters Joint Council No. 43,* 431

F.Supp. 745 (E.D.Mich.1977); (claims under § 1132(a)(1)(B) legal rather than equitable); *Gangitano v. NN Investors Life Insurance Co.,* 733 F.Supp. 342 (S.D.Fla.1990) (constitutional right to jury trial exists in § 1132(a)(1)(B) action).

The Blakes argue, however, that the change in the standard of review from arbitrary and capricious to *de novo,* made by *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), converts the claim from an equitable claim to a breach of contract action, which entitles them to a jury trial under the Seventh Amendment.

In our judgment, however, this argument cannot prevail. The nature of an action under section 502(a)(1)(B) is for the enforcement of the ERISA plan. Although the plaintiffs assert that they are claiming money damages, in effect they are claiming the benefits they are allegedly entitled to under the plan. Although here the medical treatment has been completed so that a money judgment would satisfy their demands, if the claimant were still under treatment, only an order for continuing benefits would be sufficient. This is traditionally equitable relief so that the cases relied upon by the appellants are not applicable. *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (the Seventh Amendment requires a jury trial where a statute creates legal rights and remedies enforceable in a action for damages in a court of law); *Granfinanciera, S.A. v. Nordberg,* —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (if a statutory right is not closely intertwined with a federal regulatory program, and the right is legal in nature, then it carries the Seventh Amendment's guaranty of a jury trial).

Thus we are constrained to follow the overwhelming precedent which has clearly determined that claims on medical insurance plans issued pursuant to ERISA are equitable in nature, and the *de novo* standard of review does not control the application of the Seventh Amendment. *See Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. ——, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (the

right to a jury trial is determined by "the nature of the issues involved and the remedy sought").

This decision makes it unnecessary to confront the alternate argument of defendant-appellee that because of the failure of the plaintiffs to offer sufficient evidence to prove their case, the district court would have been compelled to direct a judgment for the defendant even if a jury otherwise would be required.

■ As to the argument that Pam Blake's postpartum treatment was covered by the "sickness" provisions of the policy, a review of the record reveals that the district court must be affirmed on the findings of fact and reasoning under the proper *de novo* standard of review as reflected in its Memorandum Order attached hereto as an Appendix.

AFFIRMED.

APPENDIX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF
FLORIDA

Marlowe and Pam Blake, Plaintiffs,

vs.

Unionmutual Stock Life Insurance Co. of America, Defendant.

Case No. 87–0543–CIV–SCOTT

MEMORANDUM ORDER

Plaintiffs, Marlowe and Pam Blake, seek recovery of hospitalization and other medical expenses which Pam Blake incurred following the birth of their child. Defendant, Unionmutual Stock Life Insurance Co. of America, admits that Mrs. Blake was at all times a beneficiary of the policy but contends that it has paid her claims up to the limits of the policy. The parties agree that there are two issues: one legal and one factual. The legal issue involves which standard of review should be applied in reviewing the insurer's actions. The factual issue is whether the postpartum depression that Pam Blake suffered after giving birth was a mental illness or a physically based illness with psychiatric manifestations.

I.

*Standard of Review*

The Court has already ruled that Plaintiff's common law actions have been preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1002(1). *See Pilot Life v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Defendant argues that under ERISA the standard of review is an arbitrary and capricious action. Plaintiffs argue that the standard should be the traditional state law standard which states that where there is an ambiguity, the interpretation of the policy favoring coverage should be applied. We reject both contentions and proceed to the merits on a *de novo* standard of review. *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Court apologizes for the delay in entering its decision, but we opted several months ago to postpone it pending resolution of *Bruch.* The parties will recall that this Court previously expressed our view that the arbitrary and capricious standard was inconsistent with the underlying purpose behind ERISA. Now, guided by the correct standard as enunciated in *Bruch,* we proceed to decide the merits of this controversy.

II.

*History of the Case*

In 1984, Marlowe Blake was employed by the law firm of Wallace, Engels, Pertnoy and Solowsky. As a benefit of his employment, Marlowe and his wife Pam were insured for health and medical benefits under an insurance policy issued by Unionmutual Stock Life Insurance Company.

On August 13, 1984, Pam Blake gave birth to a healthy baby girl. Three days later, the family returned to their home, where Pam developed ill feelings toward the baby and herself. Pam described her condition as feeling like jumping out of her skin; she stated that she felt this heat in her body; and she felt itchiness. Pam tes-

tified that she was having bad thoughts about hurting the baby and herself. The couple called Pam's general physician who recommended that Pam drink a beer to help her relax. Unfortunately, the ill feelings continued. On August 20, 1984, Pam woke up and banged her head on the wall. The couple went to her physician's office, where Pam acted like a caged tiger. That same evening, Pam was admitted to Jackson Memorial Hospital where she remained until September 25, 1984.

Pam was readmitted to Jackson in October, 1984 and remained there until the end of December, 1984. After her December release from Jackson, she continued to seek and receive treatment at other hospitals. She spent two weeks at Highland Park and sought treatment at Hollywood Memorial. Pam has been out of treatment since January of 1988 and has received no medication since January, 1987. Today, Pam and the baby are doing well and enjoying a good relationship.

Unionmutual denies that it owes the Blakes any additional medical benefits. It claims that it has paid up to the policy limits set forth in Section I(2)(b)(iv) of the insurance agreement. That section limits the amount of medical care benefits for mental illness to thirty days confinement as an inpatient in a hospital and $1,000 of treatment received as an outpatient. Unionmutual has paid the Plaintiffs up to the mental illness section's limitations. Mental illness is defined in the policy as "any mental, nervous or emotional diseases or disorders."

Plaintiffs argue that the Defendant applied the wrong section. Plaintiffs claim that Pam's condition was a physically based or caused illness and is covered by the "sickness" section of the insurance agreement. Sickness is defined in the policy as an "illness or disease.... It includes pregnancy unless excluded elsewhere." Therefore, Plaintiffs claim that Pam's illness falls within the sickness section; and Unionmutual owes Plaintiffs $33,279.55 in unpaid medical bills.

Expert and treating psychiatrists and psychologists testified about the nature of Pam Blake's illness. Plaintiffs' main witnesses were Dr. Susan Moreno, treating psychiatrist at Jackson Memorial Hospital, and Dr. James Alexander Hamilton, a psychiatrist, who has spent time studying the causes and symptoms of postpartum psychoses. Defendant also relied upon the testimony of Moreno and Hamilton and called its own expert, Dr. Pinosky, another psychiatrist.

### III.

#### De Novo Review

Plaintiffs first contend that irrespective of whether this illness is organically based, the cause of the illness was pregnancy. As noted above, pregnancy is included in the sickness section. Because the policy equates pregnancy with sickness, Plaintiffs argue that all that need be shown is that the pregnancy and ensuing childbirth caused Pam Blake's illness; therefore, her postpartum depression was a complication of pregnancy and is included in the sickness section.

Even prior to Mrs. Blake's childbirth and subsequent hospitalization, she described a period of ten years in her life where she would stuff food into her mouth—cake or bread—chew it and then spit it out. This occurred approximately six nights per week. Mrs. Blake paid $15 to $20 per week to meet with a women's group to discuss diets and images. Mrs. Blake also went to a state certified social worker for group gestalt. Gestalt was described as a process whereby an individual sits in one chair, puts their feelings into another chair and talks to it.

Following the birth of her child, Dr. Charles Kram performed a psychological evaluation of Pam Blake while she was a patient at Jackson Memorial Hospital. Kram found that Mr. Blake had "longstanding personality problems" prior to her hospitalization at Jackson Memorial Hospital. Dr. Kram also found that Pam had been depressed for many years and that she felt inadequate. Dr. Moreno, a treating physician of Pam's at Jackson, agreed

with both of these findings. Dr. Kram further stated, "this patient may well have been experiencing a precarious adjustment balance for a period of time extending well back into her adolescence.... The responsibilities of motherhood may have appeared for the patient as the proverbial last straw." These findings and the past history of Mrs. Blake demonstrate that the birth of the child was not the sole cause of Mrs. Blake's illness. We agree with Dr. Kram's finding that "motherhood may have appeared as *the* proverbial last straw."

In support of the argument that all the Plaintiffs need show is a covered sickness caused the ensuing mental treatment, they cite a New York case. In *Prince v. The United States Life Insurance Company*, 42 Misc.2d 410, 248 N.Y.S.2d 336 (S.Ct. 1964), *aff'd*, 23 A.D.2d 723, 257 N.Y.S.2d 891 (1965); *aff'd*, 17 N.Y.2d 742, 270 N.Y.S.2d 209, 217 N.E.2d 33 (1966), the New York Court of Appeals affirmed a lower court's decision which held that psychiatric treatment following the loss of an eye was an "injury or sickness" within the terms of that policy. We find this case and its reasoning less than persuasive, especially when Mrs. Blake's prior mental history is considered. For these reasons, we reject this contention.

Plaintiffs next argue that if postpartum psychosis is not a complication of pregnancy, then it is a physical illness with psychiatric symptoms. They contend that an organically based illness is not a mental illness within the terms of the policy, but rather is a sickness. We again disagree.

Dr. Moreno diagnosed Pam as suffering from major depression, single episode with melancholia. Dr. Moreno further stated, "I felt [Pam Blake] was suffering from postpartum depression which we call major depression, single episode with psychotic features." When asked whether Pam Blake was suffering from a mental illness, Dr. Moreno answered, "yes." Dr. Moreno then explained her answer as meaning "a physical illness, with manifestations of a psychiatric nature."

In speaking of physical illness, Dr. Moreno is referring to imbalances in serotonin and neopinephrine or perhaps hormonal imbalances as causing Mrs. Blake's illness. Neither Pam Blake's serotonin and neopinephrine levels nor her hormonal levels were ever measured so far as this Court is aware. While Dr. Moreno did state that testing the serotonin and neopinephrine levels is difficult, she did not state why Mrs. Blake's hormonal levels were never measured. Dr. Moreno's testimony simply failed to prove a physical illness caused Mrs. Blake's psychiatric hospitalization.

Dr. Hamilton testified generally about Pam Blake's symptoms marching in step with known changes in physiology that occur after childbirth. For example, he spoke of the brief latent period between delivery and the onset of the disease; that patients suffering from postpartum psychosis generally have a good prognosis; that electroconvulsive therapy while frequently effective in other forms of psychoses is frequently ineffective here; and finally he testified concerning the hormonal changes in estrogen and progesterone which occur after childbirth.

First, we observe that Dr. Hamilton generated his opinions nearly four years after Pam gave birth to the child, and significantly, a day before the trial began. Moreover, even if her symptoms did march hand in hand with known changes in physiology, the Court does not find such medical generations sufficiently persuasive to show an organic mental disorder in this case. While we are happy to note that today Pam Blake is doing fine, the fact that postpartum patients generally have a good prognosis does not prove an organic disorder.

Dr. Moreno stated that Pam Blake responded well to the electroconvulsive therapy she received, a statement which would contradict Dr. Hamilton's view that electroconvulsive therapy would be ineffective for an organic disorder because it (ECT) would fail to clear up the underlying problem (hormonal imbalance). While Pam did relapse from her ECT treatment, Dr. Moreno testified that it is not uncommon for people who receive ECT for depression at other

times in their lives to also relapse. The fact the postpartum depression may be self-limiting does not convince us that Pam Blake suffered an organic mental illness.

Finally, while hormonal changes may be an important cause of postpartum depression, no proof has been offered in this case to show that the levels in Mrs. Blake were abnormal following childbirth. Dr. Hamilton, in a letter dated November 27, 1987, stated "the [Defendant's] motion for summary judgment selects a very strong point from Defendant's expert, Pinoski: the unproven possibility that hormonal imbalances may have been associated with Mrs. Blake's condition does not change the fact that she was suffering from a mental disorder—we cannot deny the latter—all we could say at best is that there is substantial information to the effect that this mental disorder is one which is caused by organic changes, which in turn follow childbearing."

One test that was performed on Mrs. Blake was a cortisol suppression test. It showed her serum cortisol levels to have reached 33. Any reading above 5 is considered by Dr. Moreno of Jackson Memorial Hospital to be abnormal. An abnormal serum cortisol level is not thought to be the cause of any mental illness, but rather abnormal levels are found in a variety of mental illnesses, including depression and bulimia. This test does not convince us that Mrs. Blake's illness was an organic illness with psychiatric manifestations.

Finally, we agree with Defendant's expert, Dr. Pinosky, that Mrs. Blake suffered from a mental disorder following her pregnancy. During Dr. Pinosky's twenty-five years of practice as a licensed psychiatrist, he has diagnosed more than 100 postpartum psychotic patients. Dr. Pinosky's opinion was that the policy's definition of mental illness as any mental, nervous or emotional diseases or disorders comports with Mrs. Blake's condition.

Dr. Pinosky placed great importance on the finding that Mrs. Blake had suffered from an eating disorder known as bulimia, since about the age of fourteen. Dr. Pino-

sky testified that bulimia is a mental disorder and those who suffer from it have an inordinately high association of developing a major effective disorder later in life. Dr. Pinosky contradicted Dr. Hamilton's testimony that postpartum depression tends to be self-limiting and therefore distinguishable from other mental disorders. He opined that individuals suffering from depression improve in general, not just those who suffer from postpartum psychoses.

The Court concurs with Dr. Pinosky that Mrs. Blake was not suffering from physical illness with psychiatric manifestations. We agree with Dr. Pinosky that Mrs. Blake suffered from a mental illness as defined in the terms of the insurance agreement.

In summary, Plaintiffs ask the Court not to consider the treatment Mrs. Blake received, but instead to look to the causes of the illness. Because of Plaintiffs' failure to prove an organic causation for this illness, we find that the treatment Mrs. Blake received is only more convincing proof that she suffered a mental illness within the terms of the policy. All of the hospitalizations of Mrs. Blake were in psychiatric units. She was treated primarily by psychiatrists receiving well recognized psychiatric treatment, including individual psychotherapy, psychoactive drug therapy, electroconvulsive therapy and participation in group sessions. To borrow from a euphuism, "if it looks like a duck, walks like a duck, quacks like a duck, then it's probably a duck." Here, no physician rendered Pam Blake treatment different than that rendered to other patients suffering from other forms of mental disorder. Her past medical history is consistent with such treatment. To ignore such treatment would be to ignore the realities of the evidence in favor of sympathy. Our oath prevents us from such a course.

## IV.

### Conclusion

For these reasons, the Court concludes that the Plaintiffs have failed to demonstrate that Pam Blake suffered an organic mental illness under our *de novo* review. Indeed, we find that she suffered a "men-

tal illness" within the terms of the policy; and, accordingly Unionmutual was correct in applying the limitations of the mental illness section to Plaintiffs' claims. Accordingly, we will enter judgment for the Defendant.

DONE and ORDERED in Chambers, at Miami, Florida, this 10th day of March, 1989.

/s/ Thomas E. Scott
THOMAS E. SCOTT
UNITED STATES
DISTRICT JUDGE

Copies mailed to:

Michael S. Olin, Esquire

Robert A. Wainger, Esquire