Andrew B. FRADOS, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. 04–80232–CIV.

United States District Court, S.D. Florida.

Feb. 2, 2005.

Jene Pamella Williams–Rhoads, Liggio Benrubi & Williams, West Palm Beach, FL, James B. Roche, Ogunquit, ME, for Plaintiff.

Gregory Paul McMahon, Marcus McMahon & Myers, Orlando, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon:

1.) Plaintiff's Motion to File Amended Reply and Request for Jury Trial

[DE # 46], filed on November 17, 2004;

2.) Plaintiff's Motion for Summary Judgment on the Affirmative Defense of Fraudulent Concealment [DE # 50], filed on November 29, 2004;

3.) Plaintiff's Motion for Summary Judgment on the Affirmative Defense of Failure to Mitigate and Set-off [DE # 52], filed on November 29, 2004; and

4.) Defendant's Motion for Summary Judgment [DE # 51], filed on November 29, 2004.[1]

The Court has reviewed these Motions, the Responses and Replies thereto, the Administrative Record, and is otherwise fully apprised in the premises.

## BACKGROUND

Plaintiff, Andrew Frados, was employed as a Perfusion Services Manager by Edwards LifeSciences Corporation ("Employer"). CNA 0038.[2] As part of his employment, Plaintiff was covered by an employee welfare benefit plan (the "Plan") which provided certain specified disability benefits to covered employees. CNA 0007–0026. This Plan was subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, CNA 0024–0026, and both parties stipulate that this Case is to be tried pursuant to ERISA law. (Joint Pretrial Stipulation [DE # 64] at 9.)

On May 30, 2001, Plaintiff ceased working and, on June 4, 2001, he notified De-

---

1. In their Joint Stipulation [DE # 64], the parties indicated that Defendant's Motion to Compel [DE # 43] and Defendant's Motion for Hearing [DE # 56] were no longer at issue. (Joint Stipulation at 6.)

2. The Administrative Record in this case [DE # 54] was filed on November 29, 2004, is

fendant that he was disabled. (Joint Pretrial Stip. at 7.) The cause for this disabled status was an earlier back injury and complications from corrective back surgery. CNA 0484–0486; (Pl.'s Resp. at 1–2). Plaintiff's attending physician at the time was Dr. Emilio S. Musso, an orthopedic surgeon, who verified Plaintiff's surgical procedure and restricted Plaintiff from work beginning May 30, 2001. CNA 0475. Defendant assigned a date of short-term disability beginning May 30, 2001 and began to pay benefits as of that date. CNA 0484–0486.

On October 31, 2001, Plaintiff underwent further major corrective back surgery, performed by Dr. Harvinder S. Sandhu. CNA 0372–0378. As a result of this surgery and Plaintiff's continued disabled status, Defendant approved a claim for long-term disability, effective December 12, 2001. CNA 0397–0398. When informing Plaintiff of his approval for long-term disability benefit, Defendant, in its approval letter, explicitly explained to Plaintiff that

> Benefits under this policy are payable for 12 months if you are continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and not working for wages in any occupation for which You are or become qualified by education, training or experience. After 12 months, benefits will continue only if you are continuously unable to engage in *ANY* occupation for which You are or become qualified by education, training or experience; and not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

---

Bates Stamped CNA 0001–0488, and will be cited as such. Both parties have relied on this filing as a complete and accurate copy of the Administrative Record. (Def.'s Mot. for Summ. J. at 2; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4.)

CNA 0397 (emphasis in original), *accord* Plan at CNA 0013. Thereafter, Defendant paid Plaintiff long-term disability benefits until June 11, 2003. (Joint Pretrial Stip. at 7.)

During the period between December 11, 2001 and June 11, 2003, Defendant monitored Plaintiff's medical progress using information provided by Plaintiff. CNA 0386–0391; CNA 0326–0330; CNA 0292–0293; CNA 0107–0108. Defendant also used information provided by Dr. Sandhu (surgeon and attending physician following October, 2001); CNA 0367, CNA 0343–0344; CNA 0339; CNA 0324–0325; CNA 0308; CNA 0150–0151, Dr. Musso (Plaintiff's prior attending physician), CNA 0195, Dr. Waden Emery, III (Plaintiff's neurologist), CNA 0181; CNA 0152–0157, Dr. Motiram (Plaintiff's psychologist), CNA 0179, Dr. Ira Fox (Plaintiff's pain management doctor), CNA 0171–0172; CNA 0158, Dr. Fox's physical therapists at HealthSouth Physical Therapy, CNA 0166, and Dr. Sassoon (Plaintiff's physiatrist), CNA 0170. At one point, in July 2002, Defendant disapproved further benefits, CNA 0304–0305, however this decision was appealed by Plaintiff, CNA 0292–0293,[3]

and benefits were subsequently reinstated by Defendant's Appeals Area. CNA 0194.

On May 19, 2003, Defendant issued a letter to Plaintiff informing him that his long-term disability benefits would be terminated as of June 11, 2003. CNA 0138–0140. In that letter, Defendant explained that the decision to terminate benefits was based on responses from Dr. Sandhu, Dr. Motiram, HealthSouth Physical Therapy, and Dr. Emery[4] indicating an ability to return to full-time work, subject to restriction. CNA 0139. Defendant noted that Dr. Fox deferred to Dr. Sandhu[5] and Dr. Sassoon suggested a Functional Capacity Evaluation. CNA 0139. Noting Plaintiff's inability to perform his regular occupation, but absent an indication from Plaintiff's medical providers that he could not perform any occupation, Defendant's benefits were terminated because he "no longer [met] the definition of Totally Disabled." CNA 0139. Defendant also noted several possible occupations in the medical field that Plaintiff might perform within the designated restrictions by his medical providers. CNA 0139.[6] Finally, Defendant advised Plaintiff of his right to appeal the adverse decision[7] and of his civil rights under ERISA. CNA 0139–0140.

---

**3.** Notably, in his letter of appeal, Plaintiff stated that "[i]f Dr. Sandhu finds that I am able to return to work, in my past capacity, or, with limitations he will notify you under separate cover.... [I]f the decision is made by Dr. Sandhu to send me back to work with restrictions, I will be happy to return." CNA 0293.

**4.** Dr. Emery's response was akin to deferral in that he noted that he had not seen Plaintiff since November 8, 2002 and could not comment on Plaintiff's current condition. CNA 0152–0157. Dr. Emery referred to an earlier assessment submitted in December 2002. CNA 0181; CNA 0152–0157.

**5.** In actuality, it appears Dr. Fox deferred to Dr. Sassoon, who, in turn, suggested a Functional Capacity Evaluation. CNA 0059.

**6.** Defendant received these suggestions through the use of an independent labor market study, performed by Dr. Flora Pinder, Pinder Rehabilitation Services, LLC. CNA 0133–0137. In her report, Dr. Pinder provided six examples of specific jobs in the medical field that Plaintiff could perform and that would accommodate Plaintiff's work restrictions. CNA 0133–0137.

**7.** Defendant required Plaintiff to submit any additional medical information within 60 days of the termination letter. CNA 0139. Thereafter, Defendant would respond to the additional medical information and appeal within 60 days, or, if circumstances required, Defendant would notify Plaintiff within its initial 60–day consideration period, that an additional 60 days would be required. CNA 0139–0140. Essentially, Plaintiff had 60 days

Plaintiff notified Defendant of his intent to appeal in a letter dated June 27, 2003, CNA 0101, and confirmed receipt of that letter in a letter dated July 3, 2003. CNA 0099. In his letter of July 3, 2003, Plaintiff requested copies of a Vocational Skills Analysis Report, a Labor Market Survey, and a Transferable Skills Analysis. CNA 0099. Defendant responded in a letter dated July 11, 2003, which extended Plaintiff's time to appeal through August 4, 2003. CNA 0097–0098. Defendant also issued a letter dated July 14, 2003, providing Plaintiff with the requested Vocational Assessment, the medical records used in completing the Vocational Assessment, and the Labor Market Survey. CNA 0048–0063. Defendant noted in the letter that there was no Transferable Skills Analysis completed, but that information provided during telephone interviews with Plaintiff provided sufficient data concerning education, background, and work history. CNA 0048.

On August 1, 2003, Plaintiff submitted additional information to Defendant in support of his appeal. CNA 0067–0092. Plaintiff included in this information, an Independent Vocational Assessment completed by Cathy McVay, a Certified Disability Management Specialist. CNA 0068–0084. Plaintiff also included draft affidavits of Dr. Sandhu, Dr. Emery, Dr. Fox, and Dr. Sassoon. CNA 0085–0092. Plaintiff acknowledged in his cover letter that these affidavits were not signed originals, but suggested that he would receive the signed originals "within the next few days" and would thereafter provide the signed originals to Defendant. CNA 0067.

On September 18, 2003, Defendant's Appeals Area sent Plaintiff a letter informing him that his appeal was denied and the decision of May 19, 2003 was final and binding. CNA 0064–0065. In its final denial, the Appeals Area acknowledged that Plaintiff was precluded from performing his regular occupation as a Perfusionist and was paid benefits accordingly for a 12 month period. CNA 0064. The Appeals Area then considered whether Plaintiff could perform *any* occupational work activity. CNA 0064. In making this determination, the Appeals Area noted that it relied on reports by Dr. Sandhu, Dr. Motiram, and HealthSouth Physical Therapy stating that Plaintiff was capable of performing full-time work, subject to some movement and lifting restrictions. CNA 0064. The Appeals Area also stated that it also considered Plaintiff's self-reported activities of daily living, the report of Defendant's Vocational Case Manager, and Plaintiff's submitted Vocational Assessment conducted by Cathy McVay. CNA 0065. Plaintiff subsequently filed this action in March 2004.[8]

## DISCUSSION

### 1. Plaintiff's Seventh Amendment Claim

■ Plaintiff has requested a jury trial, pursuant to the Seventh Amendment,[9] from the initial filing of this action, (Pl.'s Civil Cover Sheet), and now renews this

---

to file an appeal and additional information, and Defendant would respond to that appeal within 60–120 days thereafter. CNA 0139–0140.

**8.** Defendant notes that Plaintiff eventually filed a "partial affidavit" from Dr. Emery in February 2004. CNA 0043. The document appears to be only the first page of one of the unexecuted affidavits submitted earlier by Plaintiff, CNA 0085–0092, and does not appear to have Dr. Emery's signature. CNA 0043.

**9.** The Seventh Amendment to the United States Constitution provides the right to a trial by jury "[i]n [s]uits at common law, where the value in controversy shall exceed twenty dollars . . ."

request in his Motion to File Amended Reply and Request for Jury Trial [DE # 46]. In support of his claim to a right to trial by jury, Plaintiff cites the single case of *Gangitano v. NN Investors Life Ins. Co.*, 733 F.Supp. 342 (S.D.Fla.1990). In *Gangitano,* a suit arose when a claim for medical insurance benefits was denied, not because there was no coverage for the procedure, but rather on the sole ground that the plaintiff's condition was the result of a pre-existing medical condition. *Id.* In holding that the ERISA claim was triable to a jury, the district court noted that the jury would "be determining nothing more than whether defendant's pre-existing defense is or is not applicable; and if it is not, the dollar amount of plaintiff's damages." *Id.* at 343. Comparing such an action to a breach of contract action at common law, the district court extended Seventh Amendment protections to such claims mirroring historical common law claims. *Id.* at 343–44.

In the instant case, however, Plaintiff is asking for more than a mere decision as to applicable defenses and a determination of a monetary amount. Though Plaintiff may have couched his Complaint in terms of mere monetary damages,[10] to award Plaintiff any damages from the time between June 11, 2003 and March 12, 2004 (the date this claim was filed), this Court would essentially be ordering continuing benefits from that time to the present or, possibly, the future. Such relief was deemed equitable in nature by the Eleventh Circuit in *Blake v. Unionmutual Stock Life Ins. Co.*, 906 F.2d 1525 (11th Cir.1990). In *Blake,* all parties and the Court of Appeals acknowledged

[T]his Circuit has held that plaintiffs are not entitled to a jury trial under ERISA when the issue is whether it was arbitrary or capricious for benefits to be denied. *Chilton v. Savannah Foods & Industries, Inc.,* 814 F.2d 620 (11th Cir.1987)(rejecting claim that a suit for benefits under 29 U.S.C.A. § 1132(a)(1) should be tried to a jury); *Howard v. Parisian, Inc.,* 807 F.2d 1560 (11th Cir.1987)(stating that the former Fifth Circuit squarely held that plaintiffs in actions under 29 U.S.C.A. § 1132(a)(1)(B) are not entitled to trial by jury); *Calamia v. Spivey,* 632 F.2d 1235, 1237 (5th Cir.1980), (following *Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820 (7th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)).

Circuit courts dealing with the jury trial issue in ERISA-regulated plans have generally followed *Wardle*'s reasoning. *Cox v. Keystone Carbon Co.,* 894 F.2d 647 (3rd Cir.1990)(plaintiff's claim to Seventh Amendment jury trial dealt fatal blow by earlier decisions that section 502(a)(1)(B) claims are equitable in nature) *petition for cert. filed,* (U.S. Apr. 20, 1990)(No. 89–1721);[11] *Daniel v. Eaton Corp.,* 839 F.2d 263, 268 (6th Cir. 1988)(no right to a jury trial under § 502)(citing *Crews v. Central States,* 788 F.2d 332, 338 (6th Cir.1986)), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *Berry v. Ciba–Geigy,* 761 F.2d 1003, 1006–07 (4th Cir.1985)(no right to jury trial in termination of pension benefits); *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.), *cert. denied,* 469 U.S.

---

**10.** Plaintiff's Complaint "demands judgment against [Defendant] in an amount reflecting [Plaintiff's] past due disability benefits, interest on those sums from the date they were due, costs incurred in this action, and attor-

ney's fees to the extent allowed by law." (Pl.'s Compl. at 6.)

**11.** The Petition for Certiorari was denied at 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990).

1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *In re Vorpahl,* 695 F.2d 318 (8th Cir.1982)(no jury trial required in cases under section 502).

*Id.* at 1526. Thus, the argument in *Blake* turned, not on these established principles, but rather, on the argument that a new *de novo* standard of review relative to denials of benefits (replacing the old "arbitrary and capricious" standard) viewed claims under 29 U.S.C. § 1132(a)(1) more like a breach of contract action in law (and therefore correspondingly less equitable in nature). *Id.* The Eleventh Circuit rejected this argument, however, noting

> The nature of an action under section 502(a)(1)(B) [12] is for the enforcement of the ERISA plan. Although the plaintiffs assert that they are claiming money damages, in effect they are claiming the benefits they are allegedly entitled to under the plan. Although here ... a money judgment would satisfy their demands, if the claimant were still under treatment, only an order for continuing benefits would be sufficient. This is traditionally equitable relief ...

*Id.*

■ In essence then, the Eleventh Circuit was drawing the same distinction in *Blake* as the Court now draws today between the instant Case and *Gangitano.* The Court of Appeals later clarified any ambiguity by citing *Blake's* reasoning and reaffirming

> For purposes of Seventh Amendment analysis, ERISA has been interpreted as an equitable statute. [citations] Accordingly, no Seventh Amendment right to a jury trial exists in actions brought pursuant to ERISA.

*Stewart v. KHD Deutz of America Corp.,* 75 F.3d 1522, 1527 (11th Cir.1996); *see generally Catchpole v. Health 1st, Inc.,* 821 F.Supp. 1482 (N.D.Ga.1993)(discussing the historical and doctrinal development of the Eleventh Circuit's position on this matter). Following the reasoning of the Eleventh Circuit, the Court finds that Plaintiff's instant action and the desired remedy is primarily equitable in nature, notwithstanding Plaintiff's bare reference to money damages and his characterization of the action as a breach of contract claim. Accordingly, Plaintiff has no recourse to a jury under ERISA or the Seventh Amendment and Plaintiff's Request for Jury Trial is denied.

## 2. ERISA Standard of Review

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the United States Supreme Court established the relevant standard of review for federal courts reviewing benefits decisions made under ERISA. There, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. In those situations where an administrator or fiduciary was granted discretion, the standard of "arbitrary and capricious" or "abuse of discretion" [13] remained, subject to the Supreme Court's caution that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a

---

**12.** Section 502(a)(1)(B) of ERISA is the same section codified at 29 U.S.C. § 1132(a)(1)(B).

**13.** With regard to these standards, the Eleventh Circuit has noted that, "[w]e have equated the arbitrary and capricious standard and

the abuse of discretion standard in our post-Firestone cases. [citations] We continue to use the terminology interchangeably." *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1558 n. 1 (11th Cir.1990)

'facto[r] in determining whether there is an abuse of discretion.' " *Id., quoting* Restatement (Second) of Torts § 187, Comment *d* (1959).

In the present case, the Plan names Defendant as the insurer of the Plan. CNA 0024. The Plan also notes that Defendant has "discretionary authority to determine [Plaintiff's] eligibility for benefits and to interpret the terms and the provisions of the policy." CNA 0011. Given this discretionary language, the Supreme Court's exception to *de novo* review applies, (Def.'s Mot. for Summ. J. at 3–6; see Pl.'s Resp. at 3), however, both parties concede that Defendant was operating with an "inherent conflict of interest." (Def.'s Mot. for Summ. J. at 6 (admitting that Defendant is both a claims administrator and insurer of the Plan); Pl.'s Resp. at 3, ¶ 5.) Accordingly, Defendant's conflict of interest must be weighed as a factor when the Court is reviewing the benefits denial for an abuse of discretion.

■ In *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir.1990), the Eleventh Circuit developed a procedure for reviewing ERISA cases involving an inherent conflict of interest. *Id.* at 1561 (explaining that the Circuit Court's task was "to develop a coherent method for integrating factors such as self-interest into the legal standard for reviewing benefits determinations"). The Court of Appeals held that

> [W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation.

*Id.* at 1566. The Court then notes, however, that "it is fundamental that the fiduciary's interpretation first must be 'wrong'

from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary." *Id.* at 1567 n. 12, *citing Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir.1985)(cited with approval in *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137 (11th Cir.1989)).

■ Thus, since there is a conceded conflict of interest in the present Case, according to the Eleventh Circuit in *Brown*, the Court must first examine Defendant's policy language interpretation from "the perspective of de novo review" for correctness. If Defendant's interpretation of the policy language is "wrong" then the burden shifts to Defendant to prove no taint due to self-interest. If the policy language interpretation is correct, however, the Court will then review Defendant's application of the administrative record's facts and evidence to the policy language using an abuse of discretion standard, while also considering Defendant's conflict of interest as a factor in the abuse of discretion standard. *See, e.g., Parness v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1347, 1355 (S.D.Fla.2003)(applying an arbitrary and capricious standard of review to insurer's factual determinations, while "factoring in" conflict of interest).

### 3. Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential ele-

ment of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the non-moving party, there is evidence on which the trier of fact could reasonably find a verdict in his favor. *See Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn,* 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997). In the instant Case, then, the question is whether a Court could reasonably find that, absent a showing of self-interest in Defendant's policy language interpretation, Defendant abused its discretion in terminating Plaintiff's disability benefits.

### a.) No Genuine Issue of Material Fact

In the present case, Plaintiff's own arguments establish that there is no genuine issue as to any material fact. In Plaintiff's Motion for Summary Judgment on Defendant's Affirmative Defense of Fraudulent Concealment, Plaintiff relies on the argument that a Court should not consider "evidence that could and should have been presented in the administrative process but was not." (Pl.'s Mot. at 4.) Thus, according to Plaintiff's own argument, all evidence and facts that Defendant based its final decision [14] on should be contained in the Administrative Record. Plaintiff accordingly argues that "this Court's review is limited to the administrative record." (*Id.*); *see also, Lee v. Blue Cross & Blue Shield of Ala.,* 10 F.3d 1547, 1550 (11th Cir.1994)("Application of the arbitrary and capricious standard of review requires us to look only to the facts known to the administrator at the time the decision was made ..."); *Carnaghi v. Phoenix Am. Life Ins. Co.,* 238 F.Supp.2d 1373, 1376 (N.D.Ga.2002)("The court may review the decision of the Plan administrator only on the basis of those materials available to the administrator at the time the final appeal decision was rendered."). Thus, the evidence on which Defendant based its final appeal decision should be the only evidence the Court considers in evaluating the reasonableness of Defendant's decision. If the Court's review is limited to the Administrative Record, which was complete when Defendant reached a final decision in September 2003, the only possible "genuine issues of material fact" would be disputes over the correctness or completeness of the Administrative Record.

Notably, Plaintiff has not raised or challenged the Administrative Record in this matter as incorrect or incomplete. Indeed, in his Response to Defendant's Motion for Summary Judgment, Plaintiff references and relies on the Administrative Record [DE # 54] filed by Defendant in support of Defendant's Motion. (Pl.'s Resp. at 4.) The only indirect claim Plaintiff has made which calls into question the completeness or correctness of the Administrative Record is Plaintiff's argument that Defendant failed to give Plaintiff the statutorily required period for internal appeal. This argument, raised in Section IV, Subsection E of Plaintiff's Response to the summary judgment motion, alleges that Defendant failed to comply with federal regulations that guarantee disability-policyholders at least 180 to appeal a denial of disability benefits. (Pl.'s Resp. at 13, relying on 29 C.F.R. § 2560.503–1(h)(4).)

---

**14.** In the present case, Defendant's final decision was made on September 18, 2003 at the conclusion of the internal appellate process. At that time the administrative record on this matter, including evidence submitted by Plaintiff between the initial denial in May 2003 and the final decision in September, was final and complete.

To properly resolve and address Plaintiff's argument that Defendant was in violation of federal regulations governing requirements and procedures under ERISA, the Court held a hearing on January 20, 2005. At that hearing, the Court asked the parties to discuss Defendant's compliance with the requirements of 29 C.F.R. § 2560.503–1(h)(4) which, in turn, applies the requirements of 29 C.F.R. § 2560.503–1(h)(3) to any disability-benefits plan.[15] In response to Plaintiff's argument, Defendant pointed out that the additional requirements of Subsections (h)(3) and (h)(4) were promulgated by the Department of Labor in a November 2000 amendment to the C.F.R. provisions. *See* 65 Fed.Reg. 70,246 (Nov. 21, 2000). In that amendment, the Department of Labor specifically noted that the "regulation applies to all claims filed on or after January 1, 2002." *Id.* (codified at 29 C.F.R. § 2560.503–1(*o*)(1)). In the present case, Plaintiff's claim was filed on June 4, 2001. (Joint Pretrial Stip. at 7.) By the language of the statute, then, the new regulations under Subsections (h)(3) and (h)(4) requiring an appellate period of 180 days are not applicable to Plaintiff's claim.

At the hearing the Court specifically questioned Plaintiff on this point and invited an argument as to any reason why Plaintiff should be allowed to hold Defendant to a 180 day requirement that was not applicable to Plaintiff's claim. In response, Plaintiff's counsel said he could "think of no reason whatsoever to say that the 180 day requirement wouldn't apply ... [W]hat reason is there to tell the insurance company you shouldn't give the 180 day requirement under the statute?

There is none." (Hr'g Tr. at 19.) In response, the Court asked "[i]f the regulation says this amendment only applies to claims filed after 2002, doesn't that mean what it says?" (*Id.*) Counsel had no substantive response to the Court's question. (*Id.*) The regulation in question is specific and needs no justification or rationale for its applicability date. Lawmakers must choose a start date for application of any new law and, though they may not go into extensive detail about their rationale for choosing one date over another, all parties involved must abide by that date; a law cannot be applied to claims explicitly exempted from its purview. *But see Parness v. Metropolitan Life Ins. Co.,* 291 F.Supp.2d 1347, 1357–58 (S.D.Fla. 2003)(Zloch, J.)(using the date of appeal as the effective "claim date" for purposes of statutory applicability).

Plaintiff's claim, filed in June 2001, was subject to the regulations applicable to claims filed before January 1, 2002. Those regulations, in 29 C.F.R. § 2560.503–1(g)(3)(2000), only require that a claimant be given no less than sixty days to file an appropriate appeal. *Id.* Since Defendant provided Plaintiff an initial sixty days and an additional thirty day extension, *see, supra,* at n. 7, Defendant was in compliance with the applicable ERISA regulations and Plaintiff was given a statutorily adequate time-period to perfect his appeal and submit additional information. As such, the Administrative Record at the time of Defendant's final appeal decision in September 2003 was complete and final at that time, and the factual record upon which Defendant based its decision is not in dis-

---

**15.** While the Court did ask the parties to generally discuss Defendant's compliance with § 2560.503–1(h)(3)(i)–(v), and specifically inquired regarding the requirement of § 2560.503–1(h)(3)(iii) that a health care professional be consulted on appeal of an adverse determination, Plaintiff conceded that this re-

quirement was not statutorily required in the instant case. (Hr'g Tr. at 4–5.) Therefore the parties limited their argument to the single issue of whether Defendant was required to provide Plaintiff 180 days to perfect his internal appeal.

pute. Accordingly, there is no "genuine issue of material fact" and the Court must determine whether summary judgment is appropriate as a matter of law under the ERISA standard discussed, *supra,* Section 2.

*b.) Judgment as a Matter of Law*

(i.) Defendant's policy language interpretation

When examining a benefits decision, a court must first look to a plan administrator's policy-language interpretation to determine "correctness" from "the perspective of *de novo* review." *See, supra,* Section 2. In the present Case, Defendant made no overt "interpretation" of the plan's definition of the term "disability," but rather let the language speak for itself. The "Occupation Qualifier" language Defendant relied on in assessing Plaintiff's eligibility states

> "Disability" means that during the *Elimination Period* and the following 12 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.
> After the *Monthly Benefit* has been payable for 12 months, *"Disability"* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
> 1. continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

Plan at CNA 0013 (emphasis in original). The language relied upon clearly states that, after 12 months, a claimant may not be considered disabled if the claimant is able to engage in *any* occupation that claimant is qualified for by education, training or experience. Thus, to receive benefits for more than 12 months, a claimant must show total inability to work at any job for which claimant is qualified, not just claimant's regular occupation. In this regard, the language is clear and unambiguous and Defendant did not have to interpret vague policy terms or language; "any occupation" means just that and Defendant was simply holding Plaintiff to that standard.

■ While Defendant did not have to perform any substantial policy interpretation, Plaintiff does raise the argument that Defendant applied the incorrect definition of "disability" to Plaintiff's case, and maintains that Plaintiff would qualify as disabled under the alternative "Earnings Qualifier" language in the Plan. (Pl.'s Resp. at 5–7.) The "Earnings Qualifier" language provides

> *You* may be considered *Disabled* during and after the *Elimination Period* in any Month in which *You* are *Gainfully Employed,* if an *Injury* or *Sickness* is causing physical or mental impairment to such a degree of severity that *You* are unable to earn more than 80% of *Your Monthly Earnings* in any occupation for which *You* are qualified by education training or experience.

Plan at CNA 0013 (emphasis in original). Clearly, however, Defendant would not have been able to apply this definition of disability to Plaintiff since the Earnings Qualifier requires that a claimant be "gainfully employed." *Id.* There is no evidence in the Administrative Record suggesting that Plaintiff was gainfully employed at any time during this consideration, nor is

there any indication that Plaintiff notified Defendant of gainful employment or of Plaintiff's desire to be considered under the Earnings Qualifier. Accordingly, Defendant's use of the Occupation Qualifier was objectively "correct." Since it was using the proper definition of Disability given the facts of Plaintiff's case, and since there are no other alleged "wrong" interpretations of plan language, the Court need not consider potential bias due to Defendant's conflict of interest. Instead, the Court now looks to whether Defendant's decision was an abuse of discretion, while taking the conflict of interest into account as a factor in that consideration.

(ii.) Defendant's benefits-determination

■ In considering Defendant's factual determinations under the language of the Plan, a Court must examine that determination for an abuse of discretion; that is, "whether there was a reasonable basis for the decision." *Parness*, 291 F.Supp.2d at 1358, *citing Jett*, 890 F.2d at 1139. Upon consideration of the Administrative Record in the present case, the Court finds that Defendant's decision to terminate long-term disability benefits had a reasonable basis. Defendant had recommendations from two of Plaintiff's doctors, Dr. Sandhu and Dr. Motiram, and Plaintiff's physical therapist stating that Plaintiff was capable of full-time work, subject to some movement and lifting restrictions. CNA 0150–0151; CNA 0166; CNA 0179. Notably, Plaintiff had earlier appealed a termination of his benefits, CNA 0292–0293, and had told Defendant that "[i]f Dr. Sandhu finds that I am able to return to work, in my past capacity, or, with limitations he will notify you under separate cover.... [I]f the decision is made by Dr. Sandhu to send me back to work with restrictions, I will be happy to return." CNA 0293. This is exactly the notification Dr. Sandhu gave to Defendant in March 2003. CNA 0150–0151. Additionally, Defendant was notified by Dr. Emery that Plaintiff had not been to see the doctor since November 2002. CNA 0153–0154, 0157. It was wholly reasonable for Defendant to rely on the recommendation of Dr. Sandhu, Plaintiff's surgeon, particularly in light of Plaintiff's earlier reliance on Dr. Sandhu's opinion. It was also reasonable for Defendant to rely on the opinion of the physical therapist working directly with Plaintiff and aware of his abilities and limitations. Furthermore, Plaintiff's psychologist, Dr. Motiram, also indicated that Plaintiff was mentally in a position to return to full-time work.

Defendant also considered Plaintiff's own representations regarding activities of daily living. CNA 0065. Specifically, Defendant noted that Plaintiff could perform activities of daily living such as personal grooming, limited cooking, childcare, driving to appointments and children's school, using a home computer on a limited basis, as well as home exercise, aqua therapy, and night-school classes to be a paralegal. CNA 0065, 0103. Defendant also noted that Plaintiff intended to enroll in a low-impact yoga class. *Id.*

Given these activities and the representations by Plaintiff's doctors and, noting that some of Plaintiff's doctors deferred their recommendations regarding full-time work but none of them stated Plaintiff was incapable of full-time work, Defendant had a reasonable basis to conclude that Plaintiff was capable of full-time work subject to certain limitations. Moreover, Defendant had a Vocational Assessment performed on Plaintiff's behalf to determine what possible occupations Plaintiff could engage in subject to the restrictions suggested by Plaintiff's doctors. The Vocational Assessment, performed for Defendant by Dr. Flora Pinder, provided examples of six different jobs for which Plaintiff was sufficiently

qualified to perform within the restrictions listed by his doctors. CNA 0133–0137. Accordingly, Defendant had a reasonable basis to deny Plaintiff further long-term disability benefits, despite any "evidence that would support a contrary decision." *Jett,* 890 F.2d at 1140.

■ Considering, finally, whether Defendant's conflict of interest swayed Defendant's decision in such a way that the decision was an abuse of discretion, the Court finds that the conflict of interest did not unduly bias Defendant's judgment. First, Defendant has shown in the past that it is willing to overturn its own decisions on appeal in the interest of a claimant when supported by medical records and recommendations. This happened in Plaintiff's case during the first twelve months of Plaintiff's long-term disability. CNA 0194. Second, Defendant extended Plaintiff's long-term disability benefits past the initial twelve-month period until June 2003 to more fully investigate and ascertain whether the benefits should be continued or not. This suggests a good-faith effort by Defendant to fully consider Plaintiff's claims and seek additional input from vocational studies and medical personnel connected to Plaintiff. These efforts, combined with the submitted assessments by Plaintiff's doctors and Plaintiff's own indicated daily activities and physical abilities, collectively indicate that Defendant did not abuse its discretion in denying Plaintiff continuing long-term disability benefits.

### CONCLUSION

Finding no genuine issues of material fact and finding that there was no abuse of discretion or undue bias or self-interest on the part of Defendant, it is

**ORDERED AND ADJUDGED** that

1.) Defendant's Motion for Summary Judgment [**DE # 51**] is **GRANTED;**

2.) Defendant's Motion to Compel [**DE # 43**] and Motion for Hearing [**DE # 56**] are **DENIED AS MOOT;**

3.) Plaintiff's Motion to File Amended Reply and Request for Jury Trial [**DE # 46**] is **DENIED;**

4.) Plaintiff's Motions for Summary Judgment [**DE # 50 & # 52**] are **DENIED;** and

5.) All other Pending Motions are **DENIED AS MOOT** and this Case is hereby **CLOSED.**